Michael J. CRONIN, Plaintiff,

v.

ITT CORPORATION, Defendant.

No. 88 Civ. 4849 (KTD).

United States District Court,
S.D. New York.

March 26, 1990.

Liddle, O'Connor, Finkelstein & Robinson, New York City, for plaintiff; Jeffrey L. Liddle, Paul T. Shoemaker, Harley D. Diamond, of counsel.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for defendant; Thomas G. Rohback and William W. Patten, ITT Corp., of counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Plaintiff Michael J. Cronin brings this action alleging that defendant ITT Corporation ("ITT") discharged him in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (1982) and the New York Human Rights Law, N.Y. Exec. Law § 296 (McKinney 1982 & Supp.1990) and then retaliated against him for complaining about his ineligibility for an enhanced retirement plan. ITT moves pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing the complaint.

## FACTS

During the latter half of 1986, ITT engaged in negotiations with Compagnie Generale d'Electricite ("CGE") regarding the sale of substantial portions of ITT's business operations, including its telecommunications business. These negotiations were finalized in an agreement that took effect on December 31, 1986. Pausig Affid. ¶ 3. As a result, ITT engaged in a large-scale reduction of force and reorganization to "streamline" its headquarters operations.[1] Defendant's Rule 3(g) Statement ¶¶ 3, 4. At ITT's corporate headquarters in New York, where Cronin worked, approximately one-half of all employees resigned, retired, or were discharged. Pausig Affid. ¶ 4.

---

1. Over 90,000 of ITT's 230,000 employees worldwide ceased to be employed by ITT as of December 31, 1986. Pausig Affid. ¶ 4.

In October 1986, ITT announced a Voluntary and an Involuntary Separation Program to achieve the reduction in force. *See* Shoemaker Affid., Exh. D. As part of this effort, ITT offered certain headquarters employees an Enhanced Retirement Program ("ERP" or "Program") as part of its departure benefits or "Separation Program." The ERP benefits were substantially greater than ITT's pre-existing executive termination severance benefits. To qualify for the Program, employees had to have a minimum of five years of ITT service and had to be age fifty by December 31, 1986. Defendant's 3(g) Statement ¶ 7.

With the sale of major subdivisions to CGE, it was expected that far less litigation would need to be handled by ITT. Cronin Dep. at 86; Mackey Dep. at 40, 55.[2] Leonard Mackey, the Vice President and head of the intellectual property section of ITT's legal department and Cronin's supervisor, became responsible for reducing staff of the patent department in connection with ITT's divestitures. Mackey attests that, following the sale by ITT of major business units to CGE, he determined how the patent department would best be handled with the fewest attorneys. Mackey Affid. ¶ 3. He then identified five attorneys, out of the total of ten in the department, who were best qualified to provide needed services for the remaining litigation. As a result, the number of attorneys in the department was reduced by fifty percent. Mackey Affid. ¶ 3.

Cronin, who had been with ITT as a patent lawyer since 1969, was principally responsible for the supervision of patent litigation at the headquarters patent department. Cronin Dep. at 304. He first learned of the impact the reduction in force would have on him when his immediate supervisor Edward Fitzpatrick advised him on October 7, 1986 that "litigation or licensing was a function that was out." Cronin Dep. at 271. By October 13, 1986, Mackey advised Cronin that his position would be eliminated as a result of the reorganization. No new employee was hired to assume Cronin's responsibilities. Mackey, age sixty-one, and Lawrence Swire, age forty-seven, assumed Cronin's supervisory responsibilities for the remaining patent litigation. Mackey Affid. ¶ 8.

Cronin testified at his deposition that on October 13, 1986, Mackey offered, on ITT's behalf, to employ Cronin from October 1986 until October 1987 and that Cronin accepted the offer.[3] Cronin Dep. at 48–49; Plaintiff's 3(g) Statement ¶ 2. Mackey denies ever having this conversation with Cronin. Mackey Dep. at 79. Cronin understood the "regular" termination date to be December 31, 1986. As of December 31, 1986, Cronin was forty-nine years old and thus did not qualify for enhanced benefits under the ERP.

In early November 1986, Cronin demanded, orally and in writing, that the ERP benefits be provided to him. Complaint ¶¶ 15–16.[4] Cronin's requests for benefits were denied. Both before and after making these requests, Cronin complained to ITT about its discriminatory application of the Separation Program. Cronin Dep. at 333, 338.

---

2. All citations to deposition testimony will be cited as "Dep." at the relevant page number of the transcript submitted to the court.

3. Ronald Alice attests that Mackey told both Cronin and Alice that they had "nothing to worry about" in connection with ITT's proposed divestitures. Alice Affid. ¶.

4. Cronin testified that his requests were based in part on conversation with Robert Bosserman, General Counsel of ITT Courier Systems, who told Cronin that the ERP was a violation of ITT policy because it violated the severance policy of the personnel department and the legal policy of the legal department. Cronin Dep. at 37–38. The personnel policy provided that sev-

erance pay periods would be counted towards the vesting of any right, Cronin Dep. at 39, and the legal policy, known as the "ITT Cliffhanger Doctrine", provided that anyone close to missing a significant vesting benefit by a year or two would not be permitted to miss that benefit because of termination. Cronin Dep. at 40. Moreover, Cronin attests that Russell G. Tisman, who at the time was working as ITT's in-house lawyer responsible for the defense of discrimination claims and equal employment opportunity matters told Cronin that the Separation Program constituted a clear case of age discrimination. Cronin Dep. at 420–421, 109.

In or about November and December 1986, Cronin, along with other employees who were to be discharged, or who resigned or retired, was provided with a Separation Agreement by ITT. Defendant's 3(g) Statement at 9; Defendant's Motion for Summary Judgment, Exh. H. The Separation Agreement contained a provision that released ITT from any claim the employee might have in connection with his or her discharge. For those departing employees with ten or more years of ITT service who signed it, the Separation Agreement provided a "special award" in the amount of three months salary over and above any compensation or severance entitlement.

Cronin refused to sign the Separation Agreement and did not receive the "special award." He received, however, normal severance pay, which was not conditioned on signing the Separation Agreement. Cronin Dep. at 135–137. Cronin testified that in a telephone conversation, Mackey told Cronin that he would not be employed until October 1987 because of his failure to sign the waiver of age discrimination claims. Cronin Dep. at 137. Cronin was fired as of December 31, 1986, and his salary payments ceased as of September 11, 1987. Cronin Dep. at 11.

On August 7, 1987, Cronin filed a charge with the Equal Employment Opportunity Commission and the New York State Division of Human Rights alleging age discrimination and retaliation. The action before the New York State Division of Human Rights was dismissed for administrative convenience. Shoemaker Affid. Exh. B.

## DISCUSSION

Under the ADEA it is "unlawful for an employer to discharge an employee because of that employee's age." *Hollander v. American Cyanamid Co.,* 895 F.2d 80, 83 (Cir.1990). This protection extends to employees who are at least 40 years old. 29 U.S.C. § 631(a). Because the substantive prohibitions under the ADEA mirror those under Title VII of the Civil Rights Act of 1964, the Second Circuit has held that the "the evidentiary framework measuring dis-

crimination under the ADEA borrows from Title VII case law." *Id.* In considering a disparate treatment claim, as represented here, courts follow the three-step analysis initially set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII). *Id.* Under that analysis, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. The burden then shifts to the employer to counter the prima facie case by advancing a legitimate, non-discriminatory reason for the termination. The plaintiff in turn may attack the employer's explanation by showing evidence that the purported non-discriminatory reason was pretextual. *Id.*

### A. Cronin's Age Discrimination Claim

#### 1. *Establishing a prima facie case*

 In an action under the ADEA, the plaintiff establishes a prima facie case by showing that "(1) he was within the protected age group; (2) he was qualified for the job; (3) he was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of age discrimination." *Hollander,* at 83. The Second Circuit has recognized that the *McDonnell Douglas* standard is not a rigid one and that the " 'central question is whether [the] plaintiff has presented sufficient evidence to permit a reasonable fact-finder to conclude that age was a determinative factor in the employer's decision.' " *Montana v. First Federal Savings & Loan Assoc. of Rochester,* 869 F.2d 100, 104 (2nd Cir.1989) (quoting *Hagelthorn v. Kennecott Corp.,* 710 F.2d 76, 81 (2nd Cir.1983)).

It is undisputed that Cronin, age 49 at the time of his discharge, was within the protected age group of forty and above, that he was qualified for the position he held, and that he was discharged. The parties' dispute centers on whether he was discharged under "circumstances giving rise to an inference of age discrimination."

In reduction-in-force cases, a plaintiff meets the fourth element of the prima facie case if he establishes that some evidence exists from which a fact-finder might reasonably conclude that the employer intend-

ed to discriminate against older employees. *See, e.g., Pena v. Brattleboro Retreat,* 702 F.2d 322, 324 (2nd Cir.1983). The age discrimination claim essentially turns on whether the plaintiff can prove that "but for" his age, and the employer's desire to discriminate on that basis, plaintiff would not have been discharged. *Id.* at 323.

Cronin does not dispute that there was a significant reduction in force and reorganization at ITT and that, as a result, far less work to be performed at headquarters. Nor does he dispute that there was a need to reduce staff given the reduction in workload. The patent department lost half of its attorneys, and of those remaining all were over forty years old, and three were over fifty.[5] Significantly, the average age of the attorneys in the patent department following the reorganization was fifty-two. Prior to reorganization, the average age was just under fifty. Mackey Affid. ¶ 4. Moreover, three of the five attorneys who remained were making a higher salary than was Cronin at the time he was discharged, and most of the attorneys affected by the reorganization were younger than Cronin and were earning less. Mackey Affid. ¶ 5.

In addition, there was little litigation work left for Cronin to do after the divestiture. Although Cronin attests that the bulk of his projects remained at ITT after divestiture, of the six matters remaining with ITT which Cronin claims were suitable work for him to perform, four ended prior to Cronin's departure. Moreover, a significant portion of the other two matters were being handled by ITT's regional operating units, with supervision from headquarters. Mackey Supplemental Affid. ¶¶ 12–13. Cronin relies on the fact that litigation involving the Qume Corporation, sold by ITT as part of the CGE transaction, continued after December 31, 1986. However, all proceedings in that case had been stayed well before Cronin left and responsibility for settlement was with outside counsel and Qume representatives. Mackey Supplemental Affid. ¶¶ 6, 8–10. Furthermore,

whatever of Cronin's responsibilities that were left were handled by attorneys in the department, both of whom were over forty and one who was in his sixties.

As such, none of the factors which supported a reasonable inference of age discrimination in *Montana* are present here. In *Montana,* the majority of the fifty-six year old plaintiff's responsibilities were not eliminated; they were transferred to a twenty-six year old worker who had been hired less than a year before the reorganization and who earned a lower salary. 869 F.2d at 102, 105. Moreover, because the twenty-six year old employee was already overworked, an additional twenty-six year old employee was hired to help handle the plaintiff's prior job responsibilities.

Nor does the fact that Cronin was the first attorney from his department to leave give rise to an inference of age discrimination. Other attorneys soon followed, and Cronin was certainly not the first ITT employee to be let go as a result of the divestiture. Moreover, at least two of those attorneys who left after December 31, 1986 had, unlike Cronin, specific responsibilities in connection with the CGE transaction that necessitated an extension of their departure dates. *See* October 6, 1986 Memorandum of Leonard B. Mackey, attached to Rohback Affid., Ex. I.

Because Cronin has not shown sufficient facts from which a reasonable jury could find that ITT's actions were motivated by age discrimination, summary judgment is appropriate. *See Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1117 (2nd Cir. 1988). In the context of a motion under Fed.R.Civ.P. 56, a "genuine" dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material

---

**5.** The five attorneys who remained on staff were Leonard Mackey (age sixty-one at the time), George Murphy (age fifty-two), Lawrence Swire (age forty-seven), and Peter Abruzzese (age for-

ty-four). Mackey Affid. ¶ 4. Mackey had twenty-six years of service at ITT, Baum had twenty-three years, Murphy had seventeen years, Swire had thirteen years, and Abruzzese had twelve.

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A plaintiff must offer "concrete evidence from which a reasonable juror could return a verdict in his favor" to defeat summary judgment, *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. at 2514, and "is not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2nd Cir.1988) (*McDonnell Douglas* analysis appropriate in context of discriminatory discharge cases brought under § 510 of ERISA).

The "salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2nd Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). This is particularly true where, as here, full discovery has taken place. *Dister*, 859 F.2d at 1114.

Cronin has not shown, direct, statistical, or circumstantial evidence supporting an inference of age discrimination. *See Morser v. AT & T Information Sys.*, 703 F.Supp. 1072 (S.D.N.Y.1989) (fifty-eight year-old employee laid off as part of reduction in force did not establish prima facie case notwithstanding that portion of his duties were reassigned to a younger employee and that decision was based in part on lack of "future potential"). Indeed, when Cronin was asked at his deposition what specific facts his listed witnesses could supply to suggest that he was discharged because of age, he answered "[n]ot particularly." Cronin Dep. at 216. Cronin has therefore failed to establish a prima facie case of age discrimination and that portion of his complaint is dismissed.[6]

Because an age discrimination claim under the New York Human Rights Law is analogous to an action under the ADEA and the same elements and burden of proof apply, Cronin's state claim is also dismissed. *See Vaughn v. Mobil Oil Corp.*, 708 F.Supp. 595, 599 (S.D.N.Y.1989).

## B. Retaliation

Cronin also alleges that ITT retaliated against him for complaining about his ineligibility for the ERP and refusal to sign the Separation Agreement containing the waiver. He points to four instances of alleged retaliatory action by ITT: (1) the termination of his employment with ITT (2) the acceleration of his departure date; (3) the denial of the "Special Award" of three months pay; and (4) ITT's attempts to prevent him from obtaining other employment.

To state a claim for retaliation, an employee must show that "he was engaged in

---

**6.** Cronin also claims that he has reasonable grounds to believe that the ERP violated the ADEA in that: (a) Russell G. Tisman, ITT's attorney in charge of EEO matters, encourage Cronin to file a lawsuit against ITT challenging the enhanced early retirement program on the grounds that it was discriminatory; (b) the program was applied in a manner which violated ITT's policies and practices regarding severance and vesting in that employees who were close to being eligible for the program were not allowed to claim the ERP benefits; (c) the program was a one-time, *ad hoc* offer, and (d) the program based eligibility on factors which, ITT's lawyers had advised ITT, were not permissible under the age discrimination laws. Plaintiff's 3(g) Statement ¶ 10. However, these assertions, unsupported by any affidavits or documentation other than Cronin's own testimony, do not establish that the ERP was unlawfully discriminatory. In essence, based on Cronin's ineligibility for the Program because of his age, he is claiming that he was discriminated against because he was too young. While the issue whether an employee in those circumstances has standing to challenge the plan under the ADEA has not been directly addressed in this circuit, I have no basis here for finding, *sua sponte*, the age floor in a retirement plan to be unlawfully discriminatory. *Dister v. Continental Group, Inc.*, 859 F.2d 1108 (2nd Cir.1988) (court upheld dismissal of ADEA complaint without suggesting that there was anything wrong with an enhanced pension program containing an age component for determining eligibility); *Cipriano v. Board of Education of City School District*, 785 F.2d 51, 59 (2nd Cir.1986) ("such a floor is inherent in any age-based retirement plan within the purview of § [623] 4(f)(2)"); *see also Karlen v. City Colleges of Chicago*, 837 F.2d 314, 318 (7th Cir.) *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2038, 100 L.Ed.2d 622 (1988) ("The protected zone begins at age 40, but if on that account workers 40 or older but younger than the age of retirement could complain ... early retirement plans would effectively be outlawed, and that was not the intent of the framers of the Age Discrimination in Employment Act.")

a protected activity; that there occurred an employment action adverse to the employee; and that there existed a causal connection between the protected activity and the adverse employment action." *Hollander*, at 85.

### 1. *Cronin's discharge*

█ From the uncontested facts, Cronin has no basis for maintaining that his discharge was retaliatory. The requisite causal connection for retaliation claims may be established only if the protected action alleged to have caused the retaliation preceded the claimed retaliation. Cronin's discharge could not have been caused by ITT's retaliation for his failure to sign the Separation Agreement containing the release because only those employees who were already identified for separation from ITT were asked to sign it. Cronin was told he was to be discharged in October 1986, well before he was presented with the Separation Agreement for signature in December 1986. Likewise, Cronin made his written request for benefits under the ERP in November 1986, obviously after he was told that he was to be discharged. As such, his claim of retaliatory discharge is without merit.

### 2. *Acceleration of departure date*

█ Cronin also argues that his departure date was accelerated from October 1987 to December 31, 1986 because of his refusal to sign the Separation Agreement.

Even assuming that Cronin's discharge date was extended until October 1987, Cronin has not submitted sufficient evidence giving rise to an inference of retaliation. The acceleration of his departure date could not have been caused by Cronin's subsequent failure to sign the Separation Agreement. Cronin testified that the first time that he learned that his discharge date was changed from October 1987 to December 31, 1986 was in November 1986. Cronin Dep. at 102–3, 109–10. Cronin was not presented with the Separation Agreement for signature until December 1986. Complaint ¶¶ 26–28.

Nor is there any indication that Cronin's discharge date was changed due to his request for benefits under the ERP. According to Cronin's recitation of the facts, no one had threatened to retaliate against him for asking for ERP benefits prior to November 1986. He has not offered any evidence of a hostile reaction to this request. To the contrary, according to Cronin people at ITT were trying to help him to obtain these benefits and their attitude was "mostly solicitous and uniform in agreeing that ITT was wrong." Cronin's Memorandum in Opposition at 11. Even Mackey stated that, to the extent that he could help Cronin obtain ERP benefits, he would. Cronin Dep. at 47–48. As ITT points out, it is illogical to argue that the very people who were trying to help Cronin get ERP benefits in December would have retaliated against him in November for seeking those benefits. Absent concrete particulars from which a causal connection can be inferred, Cronin does not establish the requisite "but for" causation. Failing to show a nexus between the two, there cannot be the "retaliation" which Cronin alleges.

Moreover, ITT stated a valid business reason for discharging Cronin on December 31, 1986. That was the closing date for the CGE transaction and was the general date for discharge; ITT had no reason to keep him beyond that date. The Voluntary Separation Program also provided that termination "generally will occur by year end, unless management identifies a specific business need for continuing employment to a later date ..." *See* Rohback Affid. Exh. G at 1–2. In addition, Cronin did not receive one of the letters from Ralph Pausig, Senior Vice–President and Director of Administration for ITT, dated October 9, 1986 to those individuals whose employment was extended to assist with transition matters relating to the CGE transaction. Cronin Dep. at 390–94. Cronin stated that he did not previously work on the CGE transaction, that he had no identifiable role to play in the transition, and that he did not know what job he was supposed to perform after December 31, 1986. Cronin Dep. at 49–50.

### 3. *Denial of three month's pay*

█ Cronin also contends that ITT's refusal to pay him three month's salary was

motivated by a desire to retaliate against him because of his refusal to sign the Separation Agreement and his filing of a claim of age discrimination against ITT. However, there is no indication on the record before me that Cronin's denial of a special award in the amount of three month's pay was retaliatory. Cronin did not fulfill the conditions necessary for him to become eligible to receive the award. As part of both the Voluntary and Involuntary Separation Plan, departing employees were offered an option to elect a cash award in addition to their notice and severance pay by signing a Separation Agreement that contained a release clause. *See* Separation Agreement Form, received by M. Cronin, Rohback Affid, Exh. H. Cronin admitted that the special award was separate and apart from the severance pay to which he was entitled, and that he was paid his full severance pay. Cronin Dep. at 134–37. Cronin did not receive the special award simply because he did not sign the Separation Agreement. As such, his retaliation claim is without basis and is dismissed.

### 4. *ITT prevented employment*

■ Finally, although not alleged in his complaint, Cronin claims that ITT interfered with Cronin's efforts to find new employment in an attempt to retaliate against Cronin because of his refusal to sign the release and his complaints that the ERP was discriminatory. Specifically, Cronin testified that ITT sought to prevent his employment by Qume, a subsidiary of Alcatel, or Siemens. Cronin Dep. at 131, 218. Cronin testified that he was told by George Graf, patent counsel for an ITT subsidiary in Germany, that people in the Siemens patent department in Germany had spoken about giving Cronin a job offer but that Graf told them that Cronin was "unsuited for the job." Cronin Dep. at 186–188. Further, in the summer of 1987 Cronin testified that he was working for Alcatel, a company in which ITT was a substantial stockholder, and that ITT "asked Mr. Graf to try to convince the president of Qume to

cease using my [Cronin's] services." Cronin Dep. at 197–98.

Cronin has not set forth any evidence that ITT tried to prevent him from getting another job. Cronin has not submitted affidavits from any witness to sustain his theory that ITT attempted to thwart his employment possibilities. The only evidence submitted by Cronin in support of this assertion is his own testimony. He does not present an affidavit from anyone he names as involved in his post-ITT employment history. ITT, however, has submitted an uncontradicted affidavit from George Graf, which states: "No one at ITT told me to give Mr. Cronin a bad recommendation, and no one at ITT has ever told me to do anything to prevent Mr. Cronin from gaining or retaining employment." Graf Affid. ¶ 4.

Although not asserted in his complaint, Cronin also avers that ITT's General Counsel, Howard Aibel, told Cronin in February 1987 that if Cronin filed an age discrimination case against ITT, Cronin would never work in the United States again. However, from Cronin's own testimony it is apparent that ITT offered Cronin placement assistance, both before and after he left ITT, which he refused. Cronin Dep. at 334–37. Moreover, other ITT employees offered Cronin placement assistance and referred Cronin to possible job opportunities. Cronin Dep. at 192, 209, 351–52, 356–368. Indeed, in April 1988, after the complaint in this action was filed, Cronin was hired at the request of ITT to assist in a litigation.[7] Cronin Dep. at 357–59. Cronin has thus presented no facts supporting his charge that ITT, and Aibel in particular, prevented him from obtaining employment.

It is instructive to note that the Second Circuit in *Hollander v. American Cyanamid* recently upheld summary dismissal of a retaliation claim on arguably stronger facts than are presented here. In *Hollander*, a fifty-seven year-old plaintiff, after being discharged from defendant employer, brought age discrimination claims with the

---

**7.** Aible approved ITT's retention of Cronin. Aible Dep. at 150. Moreover, Aible approved a $17,500 bonus that was awarded to Cronin on March 10, 1987, after the alleged confrontation. Aible Dep. at 162; Rohback Affid. Exh. J.

Equal Employment Opportunity Commission and the Connecticut Commission on Human Rights and Opportunities. Plaintiff then sought employment with a rival medical device manufacturer. The plaintiff offered to show the rival company a film of scientific processes that was disputably proprietary information belonging to the defendant. The rival company then contacted the defendant regarding both the film and the plaintiff's application. The defendant wrote a letter to the plaintiff warning him that his attempt to secure employment with the rival violated his non-competition covenant with the defendant and that his offer to show the film violated the defendant's proprietary interests. The rival company did not hire the plaintiff. The Second Circuit found that no evidence on the record "tends to show that a retaliatory motive" explained the defendant's letter to the plaintiff and that the rival did not attribute its hiring decision to any actions undertaken by the defendant. *Hollander*, at 85–86. Likewise, Cronin has not offered any evidence that would fulfill the final requirement of a causal nexus between his voicing complaints about the ERP, on the one hand, and his purportedly thwarted attempts to seek other employment, on the other.

In sum, ITT's motion for summary judgment is granted and the complaint is dismissed in its entirety.

SO ORDERED.